# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS KEESLING, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | C.A. No. 2026-0140-LM |
| WORLD CLASS HEALTH, INC., a Delaware Corporation, | ) ) ) ) | |
| Defendant. | ) | |

Date Submitted: June 10, 2026
Final Report: August 14, 2026

## POST-TRIAL FINAL REPORT

Thomas Keesling, Parma, OH; *Plaintiff.*

Joseph B. Cicero, Dakota B. Eckenrode, CHAPMAN BROWN CICERO & COLE, LLP, Wilmington, DE; *Counsel for Defendant.*

**MITCHELL, M.**

1

## I.  INTRODUCTION

This action arises under 8 Del. C. § 220.  Plaintiff Thomas Keesling, a former consultant and current stockholder of Defendant World Class Health, Inc., demanded inspection of books and records to value his equity and to investigate potential mismanagement, wrongdoing, and breaches of fiduciary duty.  The Company declined the demands, asserting that a provision in Keesling's Stock Option Agreement waived statutory inspection rights, that Keesling lacked a proper purpose, and that the demands exceeded the scope of Section 220.  As such, this action required the Court to determine whether the Option Agreement effected a waiver of Plaintiff's statutory inspection rights, whether the demand satisfied § 220's procedural requirements, whether Plaintiff established a proper purpose, and, if so, the necessary and essential scope of inspection under the statute.

As further explained herein, the Court finds that the Option Agreement's waiver did not bar Plaintiff's statutory inspection rights.  Only Plaintiff's November 26, 2025, demand, however, satisfied Section 220's procedural requirements.  Plaintiff established proper purposes to value his shares and investigate potential corporate mismanagement, but his inspection is limited to records that are necessary and essential to accomplish those purposes, not the broader categories of documents he requested.  Accordingly, Plaintiff's demand is **GRANTED** in part and **DENIED** in part.  This is my Final Report.

2

## II.   FACTUAL BACKGROUND[1]

### A.   The Parties

Defendant WCH ("WCH" or the "Company") is a Delaware corporation operating in the healthcare industry whose sole director is Siddharth "Sid" Nambiar.[2] At all relevant times, Siddharth Nambiar served as WCH's Chief Executive Officer, and acted on the Company's behalf in its dealings with Thomas Keesling (the "Plaintiff" or "Keesling").[3]  Keesling, a longtime healthcare executive, co-founded IndusHealth, Inc. ("IndusHealth"), with Rajesh Rao.[4]  Through his work with IndusHealth, Keesling developed a business relationship with WCH, which ultimately evolved into an ongoing consulting arrangement and, later, Keesling's ownership interest in WCH.[5]

---

[1]  The facts in this Report reflect my findings based on the record developed at the half-day trial held on June 10, 2026.  I grant the evidence the weight and credibility I find it deserves.  Citations to the Docket are cited in the form of "D.I. __."  Citations to the transcript are in the form of "Tr. __."  The parties submitted joint exhibits numbered 1–32.  Citations to the joint exhibits are in the form of "JX__."

[2]  D.I. 1 at 7;  D.I. 34 at 10;  D.I. 36 at 2.

[3]  D.I. 1 at 4;  D.I. 34 at 14.

[4]  D.I. 1 at 12.

[5]  D.I. 1 at 10;  D.I. 34 at 33;  D.I. 36 at 5.

3

## B.    IndusHealth Transaction

On May 14, 2024, WCH and IndusHealth executed a term sheet ("Term Sheet") contemplating WCH's acquisition of IndusHealth.[6]   The Term Sheet contemplated that the parties would negotiate and execute definitive transaction documents, and expressly provided that, except for certain enumerated provisions, binding obligations would arise only upon the execution of those definitive agreements.[7]

Consistent with the Term Sheet, WCH executed documents that were required to complete the transaction, including an Employment Agreement ("Employment Agreement"), and Independent Contractor Agreement ("Independent Contractor Agreement") between the Company and Keesling on May 14, 2024.[8]   Under the Independent Contractor Agreement, Keesling agreed to provide consulting services to WCH, and would have been eligible to receive options to purchase WCH common stock, subject to approval by WCH's Board of Directors.[9]

---

[6]  D.I. 36 at 2.

[7]  *See* JX-1 at 3 ("Legally binding obligations between the parties will be created only through execution and delivery of definitive documents.").

[8]  D.I. 36 at 3–4.

[9]  *Id*. at 3.

## C. Execution of the Equity Plan Option Agreement & Waiver

On April 16, 2025, nearly one year after the parties executed the Term Sheet, WCH delivered to Keesling the Equity Incentive Plan Option Agreement ("Option Agreement" or "Agreement") under the Company's 2024 Equity Incentive Plan.[10] The Agreement granted Keesling the option to purchase vested shares of WCH shares and included Section 15 titled "Waiver of Statutory Information Rights."[11] The parties dispute the legal effect of that provision, which lies at the center of this Action.

On April 17, 2025, one day after receiving and executing the Option Agreement, Keesling submitted a request to exercise 5,000 vested stock options.[12] WCH did not immediately approve the exercise because it was evaluating its potential legal remedies related to Plaintiff's failure to comply with his obligations under the Term Sheet.[13] Eventually, on September 30, 2025, WCH's Board authorized Keesling's exercise request and approved the issuance of 5,000 shares of WCH common stock.[14] From that point forward, Keesling became a stockholder of WCH.

---

[10] *Id*. at 4.

[11] *Id*. at 4–5, 15.

[12] D.I. 34 at 14;  D.I. 36 at 5.

[13] D.I. 36 at 5.

[14] *Id*.

**D.     Plaintiff's Section 220 Demands**

The parties' relationship deteriorated during 2025 as disagreements emerged concerning the status of the IndusHealth transaction and WCH's alleged use of IndusHealth's business information.     Keesling believed WCH had used IndusHealth's operating history and performance metrics in connection with its November 2024 and April 2025 financing rounds, which together raised approximately $18 million, despite never completing the acquisition contemplated by the May 2024 Term Sheet.[15]  According to Keesling, WCH never produced the definitive transaction documents referenced in the Term Sheet.[16]  Those concerns prompted Keesling to seek inspection of WCH's books and records.

On March 21, 2025, Keesling served his first demand seeking to inspect WCH's books and records.[17]  He followed with a second written demand on April 4, 2025, again requesting inspection after receiving no substantive response to his initial demand.[18]  On October 20, 2025, Keesling served a third inspection demand requesting, among other things, that WCH cease using IndusHealth's proprietary

---

[15]  D.I. 34 at 12, 19.

[16]  *Id*. at 20.

[17]  JX-4;  D.I. 36 at 4.

[18]  JX-6;  D.I. 34 at 16;  D.I. 36 at 4.

information and correct what he characterized as misrepresentations concerning the parties' Term Sheet.[19]

WCH responded to the demands by disputing both the sufficiency of Keesling's inspection demand and the merits of the allegations contained in his October 20, 2025 letter, characterizing those allegations as "unfounded" and "legally insufficient."[20]  The Company advised that, if Keesling initiated litigation on those grounds, it would "vigorously defend itself" and anticipated litigation costs exceeding more than $300,000.[21]  At the same time, WCH offered to purchase Keesling's entire equity interest for $200,000, subject to a mutual release of claims, stating that the offer would remain open until November 5, 2025.[22]  On November 10, 2025, WCH terminated Keesling's consulting Independent Contractor Agreement.[23]  Keesling contends that the termination did not comply with Section 10.2 of the Independent Contractor Agreement.[24]

On November 26, 2025, Keesling served his fourth and final demand ("November Demand").[25]  The demand sought inspection of numerous categories of

---

[19]  *See* JX-11.

[20]  *See* JX-12.

[21]  *Id*.

[22]  *Id*.

[23]  *See* JX-13.

[24]  D.I. 34 at 17

[25]  *See* JX-14.

books and records, including board and committee minutes, stock ledgers, capitalization tables, documents concerning his equity interest and termination, materials relating to WCH's November 2024 and April 2025 financing rounds, communications related to the CEO's personal share-purchase request, and other records relating to the Company's relationship with IndusHealth.[26] For purposes of the analysis that follows, it is important to distinguish the purposes articulated in the November Demand from the manner in which those purposes were later characterized in the Complaint. The Demand expressly identified two purposes: (1) valuation of Plaintiff's equity interest and (2) investigation of potential mismanagement, wrongdoing, and breaches of fiduciary duty.[27] Although the Demand separately sought records concerning IndusHealth and the Term Sheet, it did not articulate an independent proper purpose directed to those matters. The Complaint, by contrast, characterizes Plaintiff's purposes as three-fold, adding assessment of the Company's exposure to claims arising from discrepancies between the IndusHealth Term Sheet and investor representations as a distinct third purpose, and the parties' briefing largely follows that three-part framing.[28]

---

[26] *Id.*

[27] D.I. 1 at 3;  JX-14;

[28] *See* D.I. 1 at 3;  D.I. 34 at 19–21;  D.I. 36 at 23.

Because it is the Demand, not the Complaint or the parties' subsequent characterization of it, that must satisfy Section 220's requirements, the Court's analysis below takes the Demand's two stated purposes as the operative frame of reference.

### E. Procedural Posture

Plaintiff commenced this action on February 2, 2026 seeking to inspect WCH's books and records under 8 Del. C. § 220.[29] WCH answered, denying Plaintiff's entitlement to inspection asserting, among other things, that Plaintiff contractually waived his statutory inspection rights, failed to establish a proper purpose, and sought records beyond the scope permitted by Section 220.[30] The Court conducted a half-day paper-record trial on June 10, 2026.[31] At the conclusion of trial, this matter was taken under advisement.

## III. ANALYSIS

Plaintiff contends that he is entitled to inspect WCH's books and records to value his equity interest, investigate potential corporate mismanagement arising from WCH's relationship with IndusHealth and subsequent financing rounds, and assess the Company's governance.[32] WCH responds that Plaintiff contractually

---

[29] *See* D.I. 1.

[30] *See* D.I. 19.

[31] *See* D.I. 58.

[32] D.I. 1; D.I. 34.

9

waived his statutory inspection rights, failed to establish a proper purpose, and, in any event, seeks books and records beyond those permitted by Section 220.[33]

For the reasons that follow, I conclude that Plaintiff did not waive his statutory inspection rights, and only the November Demand satisfied Section 220's procedural requirements. Inspection is limited to those records that are necessary and essential to accomplish those purposes under the amended statute subject to the limitations discussed below.

## A.    Legal Standard

Under 8 Del. C. § 220(b), a stockholder seeking inspection must first serve a verified written demand.[34] When the request extends beyond the stock ledger or list of stockholders, the stockholder must establish that the demand was made in good faith for a proper purpose.[35] Plaintiff must also describe both the purpose and the requested records with reasonable particularity, and demonstrate that the requested records are specifically related to that purpose.[36] If the corporation refuses the demand or fails to respond within the statutory period, the stockholder may commence an action under Section 220(c). If the stockholder proves compliance with Section 220(b), the Court may order production of the categories of books and

---

[33] D.I. 19;  D.I. 36.

[34] 8 Del. C. § 220(b).

[35] *Id*. § 220(b)(2)(a).

[36] *Id*. § 220(b)(2)(b)–(c).

records identified in the statute.[37] Where certain formal corporate records do not exist, the court may instead order production of their functional equivalent, but only to the extent necessary and essential to accomplish the stockholder's proper purpose.[38] Requests beyond the enumerated categories expressly identified in Section 220 face a heightened standard. The Court, therefore, must determine not only whether inspection is warranted, but also whether the particular categories of documents sought satisfy the limitations imposed by the amended statute.

## B. Principles Governing Waiver of Statutory Inspection Rights

Waiver requires an intentional, knowing, and voluntary relinquishment of a known right.[39] Because waiver relinquishes an existing legal right, Delaware courts require any waiver, and particularly a waiver of statutory rights, be unequivocal and "clearly and affirmatively expressed in the relevant document."[40] These are two distinct requirements. The first portion requires clarity, asking whether the operative language, read on its face, unambiguously relinquishes the right at issue. The second portion requires knowledge and voluntariness, asking whether the party who executed the document actually possessed knowledge of all material facts and the

---

[37] *Id.* § 220(c).

[38] *Id.* § 220(f).

[39] *Manti Hldngs., LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1210 (Del. 2021) (quoting *Minna v. Energy Coal S.p.A.*, 984 A.2d 1210, 1214 (Del. 2009)); *Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 125 (Del. Ch. 2000).

[40] *Kortum*, 769 A.2d at 125.

11

rights and circumstances surrounding its relinquishment.[41]  Delaware law recognizes an important distinction between restrictions on statutory stockholder rights imposed through charter or bylaw provisions and those contained in stockholder-level agreements.  The distinction reflects, at least in part, the different forms of consent implicated by each: charter and bylaw provisions may operate through an implied-consent regime, whereas stockholder-level agreements generally rest on the stockholder's actual contractual consent.[42]  However, whether a private bargained for stockholder-level agreement may accomplish this is a different question, that courts have deemed may be enforceable if the waiver is sufficiently clear.[43]

In *Manti Holdings,* the Delaware Supreme Court enforced a waiver of appraisal rights under 8 *Del. C.* § 262, but took care to limit its holding to the record before it, where the stockholders were "sophisticated and informed stockholders, who were represented by counsel and had bargaining power," and who received

---

[41]  *Bantum v. New Castle County Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) ("Waiver is the voluntary and intentional relinquishment of a known right.  It implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those [ ] rights.").

[42]  *See Peneff Hldngs., LLC. v. Nurture Life, Inc.,* 2024 WL 3964006, at *5 n.40 (Del. Ch. Aug. 28, 2024); *Abry P'rs V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1059–1063 (Del. Ch. 2006).

[43]  *See New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 540 (Del. Ch. 2023); *Peneff Hldngs.,* 2024 WL 3964006, at *5.

valuable consideration in exchange for the waiver.[44] The Court repeated that premise throughout its opinion.[45]

Two principles follow. First, a stockholder may waive a statutory right, including a right of inspection under Section 220, through private agreement, so long as the waiver is clear and affirmatively expressed.[46] However, the clarity of the text does not end the inquiry. The Court must also determine whether the surrounding circumstances, including, but not limited to, whether the waiving party was represented by counsel, had bargaining power, and possessed the sophistication to appreciate what was being relinquished, to establish that the waiver was knowing and voluntary.[47]

### C. The Parties Advance Competing Interpretations of Section 15 and Its Enforceability

Plaintiff challenges Section 15's waiver enforceability on several grounds.[48] He argues that a later-delivered boilerplate waiver cannot retroactively extinguish inspection rights that had already been asserted; that the waiver was not clearly and

---

[44] *Manti Hldngs.,* 261 A.3d at 1204 ("Accordingly, we hold that Section 262 does not prohibit sophisticated and informed stockholders, who were represented by counsel and had bargaining power, from voluntarily agreeing to waive their appraisal rights in exchange for valuable consideration.").

[45] *See id.* at 1220, 1225.

[46] *Kortum*, 769 A.2d at 125; *Peneff Hldngs.*, 2024 WL 3964006, at *5.

[47] *Manti Hldngs.,* 261 A.3d at 1204, 1221–22.

[48] *See* D.I. 43 at 8–13.

13

affirmatively expressed in context; and that any purported waiver was neither knowing nor voluntary because it appeared in a standard-form Option Agreement, and was presented without negotiation.[49] Plaintiff further argues that his March 21, 2025, and April 4, 2025, demands predated the delivery of the Option Agreement and that Section 15 does not expressly apply to demands already pending or previously asserted.[50]

WCH responds that Delaware's strong policy favoring freedom of contract permits a private waiver of statutory inspection rights where the waiver is clearly and affirmatively expressed.[51] It contends that Section 15 satisfies that standard because it appears in a separate provision entitled "Waiver of Statutory Information Rights" within the ten-page Option Agreement and unambiguously states that Plaintiff waived his statutory inspection rights.[52] WCH further asserts that Plaintiff reviewed the Option Agreement before exercising his options and accepted the benefits it conferred, and therefore should be bound by its terms.[53] WCH contends

---

[49] *Id*. at 8–13, 39–40.

[50] *Id*. at 9.

[51] D.I. 36 at 13–15.

[52] *Id.*

[53] *Id*. at 14–16.

that the clarity of the contractual language, coupled with Delaware's strong policy favoring freedom of contract, compels enforcement of Section 15.[54]

### D. Section 15 Does Not Bar Plaintiff's November 26, 2025, Verified Demand

The Section 15 waiver is not enforceable to bar the November 26, 2025, demand. Its language clearly and affirmatively waives Plaintiff's statutory inspection rights on its face, satisfying the first requirement described above. But the record does not establish that Plaintiff knowingly and voluntarily relinquished those rights, so the waiver fails on the second, independent requirement.

The record reflects that Plaintiff proceeded without counsel throughout the negotiation and execution of the Option Agreement.[55] Plaintiff is an educated and accomplished professional in the healthcare industry; however that professional accomplishment is not the same as investment sophistication.[56] The Court finds that distinction significant. The record does not reflect that Plaintiff had experience negotiating equity incentive plans, venture financing documents, or contractual waivers of statutory stockholder rights, the kind of experience that distinguished the

---

[54] *Id.* at 14.

[55] Tr. 84:3–85:7.

[56] *See* D.I. 34 at 10; The Court uses the term "sophisticated investor" in its legal sense, referring to a person's financial knowledge and experience in evaluating investments, rather than as a reflection of the person's general intelligence, professional accomplishments, or expertise in another field.

*Manti Holdings* stockholders. Unlike the negotiated stockholders' agreement at issue in *Manti Holdings,* Section 15 appears as one provision within the Agreement issued to Plaintiff as part of his compensation. Nothing in the record suggests that Section 15 was separately negotiated or that the parties discussed the consequences of waiving Section 220 rights.[57]

The trial record confirms Plaintiff's own uncertainty about the very interest he purportedly waived his right to investigate. Plaintiff testified that he believed he had acquired an ownership interest in the Company based on the parties' May 14, 2024 Term Sheet and the parties' subsequent dealings.[58] He further testified that he believed he had been excluded from multiple financing rounds and "kept in the dark" regarding his own equity position and share account.[59] The record also reflects that Plaintiff sought confirmation of his equity status and attempted to participate in a financing round before the Company recognized him as a stockholder.[60] These events demonstrate that Plaintiff himself remained uncertain regarding the existence, timing, and scope of his alleged ownership interest. Although the basis for those beliefs was not made clear, they show Plaintiff did not have a settled understanding of his own equity position when he executed the Option Agreement. A stockholder

---

[57] D.I. 34 at 10; Tr. 84:3–85:7.

[58] Tr. 11:4–13:16; 26:5–28:21; D.I. 34 at 14; D.I. 36 at 5.

[59] Tr. 15:17–21.

[60] *See generally* JX-3.

who is uncertain what he owns is poorly positioned to knowingly relinquish the right to inspection, the very right that exists, in part, to resolve that uncertainty.

This conclusion is consistent with the recent decision in *Bernstein*.[61] There, the Court enforced a general release barring a direct Section 220 action where the release was contained in a redemption agreement that the stockholder negotiated through counsel.[62] *Bernstein* did not apply *Manti Holdings'* knowing and voluntary framework and did not turn on stockholder inspection sophistication; it resolved the scope of a general release under ordinary contract interpretation principles. But the contrast is instructive. The stockholder in *Bernstein* negotiated, through counsel, the very transaction that contained the release he later sought to avoid. The Plaintiff here, by contrast, executed a standard form agreement, unrepresented, with no negotiation over Section 15 and no discussion of the rights it purported to extinguish.

Although Delaware law permits private parties to waive statutory rights, including rights of inspection, under appropriate circumstances, the surrounding facts here do not establish the knowing and voluntary relinquishment needed to enforce the waiver.[63] On this record, Plaintiff was unrepresented, did not negotiate Section 15, and was himself uncertain about his equity interest.

---

[61] *Bernstein v. MyJoVE Corp.*, 2026 WL 1907263 (Del. Ch. July 2, 2026).

[62] *Bernstein*, 2026 WL 1907263, at *3–4.

[63] *Juul Labs, Inc. v. Grove*, 238 A.3d 904, 919–20 (Del. Ch. 2020); *Peneff Hldngs.*, 2024 WL 3964006, at *5.

The Court concludes that Plaintiff is not a party for whom Section 15 waiver is enforceable. Section 15 therefore does not bar Plaintiff's November Demand.

### E. Only Plaintiff's November 26, 2025, Demand Satisfied Section 220's Procedural Requirements

Defendant argues that Plaintiff's March 21, 2025, and April 4, 2025, demands failed to satisfy Section 220 because Plaintiff had not yet become a WCH stockholder and neither demand complied with the statute's form-and-manner requirements.[64] WCH further asserts that Plaintiff's October 20, 2025, demand likewise failed to comply with Section 220 because it was not made under oath as required by Section 220(b).[65] The Court agrees.

Section 220 requires strict compliance with its procedural requirements. A stockholder seeking inspection must establish both that he held stock at the time the demand was made and that the demand complied with the statute's prescribed form and manner requirements.[66] Plaintiff executed the Option Agreement from WCH on April 16, 2025.[67] Plaintiff exercised the options granted under that Agreement on April 17, 2025.[68] WCH's Board did not approve Plaintiff's exercise request and

---

[64] D.I. 36 at 4; JX-11.

[65] D.I. 36 at 4.

[66] 8 Del. C. § 220(c)(2).

[67] D.I. 36 at 4.

[68] *Id*. at 5.

18

issue the corresponding shares until September 30, 2025, at which time Plaintiff became a WCH stockholder.[69] Accordingly, Plaintiff did not satisfy the stockholder-status requirement when he served his March 21, 2025, and April 4, 2025, demands. Because Plaintiff was not yet a stockholder, he could not invoke the inspection rights afforded by Section 220, and those demands therefore failed to satisfy the statute's procedural requirements.

Plaintiff's October 20, 2025, demand suffered from a different procedural defect. Although Plaintiff had become a stockholder by that time, the October 20 demand was not made under oath.[70] Section 220 expressly requires that a demand be made under oath, and Delaware courts require strict adherence to that statutory requirement.[71] Accordingly, Plaintiff's October 20, 2025, demand likewise failed to satisfy Section 220's procedural requirements.

Plaintiff held WCH stock when he served his November 26, 2025, demand. Unlike Plaintiff's three earlier demands, the November 26 demand was made under oath after Plaintiff became a stockholder.[72] Accordingly, only Plaintiff's November 26, 2025, verified demand is properly before the Court and forms the basis for the Court's remaining analysis.

---

[69] *Id.*

[70] JX-11.

[71] *See generally* 8 Del. C. § 220.

[72] *See generally* JX-14.

19

### F.     Plaintiff's Proper Purposes

Section 220 requires a stockholder to establish that the requested inspection is sought for a proper purpose—that is, a purpose reasonably related to the person's interest as a stockholder.[73] Delaware courts have long recognized that valuing one's stock is a paradigmatic proper purpose under Section 220.[74] Likewise, investigating possible corporate mismanagement or breaches of fiduciary duty constitutes a proper purpose where the stockholder establishes a credible basis from which the Court may infer possible wrongdoing.[75] Although the credible basis standard is the lowest burden of proof recognized under Delaware law, it nevertheless requires some evidence from which the Court may infer possible mismanagement.[76] I evaluate Plaintiff's asserted purposes under those principles.

Plaintiff asserts two proper purposes in his November Demand: to investigate potential mismanagement, wrongdoing, and breaches of fiduciary duties; and valuation of his equity interest.[77] Plaintiff contends that these purposes are

---

[73]  8 Del. C. § 220(b)(2).

[74]  *See Bosse v. WorldWexDeb Corp.,* 2009 WL 2425718, at *1 (Del. Ch. July 30, 2009).

[75]  *See Moran v. Unation, Inc.*, 2025 WL 3706330, at *6 (Del. Ch. Dec. 22, 2025) ("Delaware law recognizes a variety of purposes that are reasonably related to a person's interest as a stockholder, including valuing one's ownership interest and investigating possible waste, mismanagement, or breaches of fiduciary duty.").

[76]  *See generally Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 123–25 (Del. 2006).

[77]  D.I. 1 at 3; JX-14. Although the Complaint characterizes Plaintiff's purposes as three-fold, and the parties' briefing largely conforms to that characterization, a stockholder cannot expand or alter the purposes stated in a Section 220 demand through subsequent

reasonably related to his interests as a WCH stockholder and justify inspection of the requested books and records.

Defendant rebuts Plaintiff's asserted proper purposes by arguing that Plaintiff's purposes regarding stock valuation and the IndusHealth Term Sheet are purely personal and stem from Plaintiff's role as co-founder of IndusHealth rather than his role as a stockholder of WCH.[78] Defendant also claims that Plaintiff's governance concerns lack a credible basis and that the chronology of Plaintiff's inspection demands demonstrate an effort to leverage Section 220 as a fishing expedition and advance broader contractual disputes arising from the failed IndusHealth transaction.[79]

Regarding Plaintiff's proper purpose, Plaintiff's purpose for valuation of his WCH stock is a valid purpose because it is reasonably related to Plaintiff's role as a stockholder and is a recognized proper purpose under Section 220. A stockholder's interest in valuing his ownership interest lies at the core of the inspection rights afforded by the statute.[80]

---

litigation. *Fuchs Fam. Tr. v. Parker Drilling Co.*, 2015 WL 1036106, at *4 (Del. Ch. Mar. 4, 2015). The Demand did not articulate an independent proper purpose directed to the IndusHealth or Term Sheet, and this report accordingly addresses the two purposes stated in the Demand itself.

[78] D.I. 36 at 19–30.

[79] *Id*. at 10, 29–30.

[80] *See Bosse,* 2009 WL 2425718, at *1.

Plaintiff's next purpose to investigate potential mismanagement is also a valid purpose because Plaintiff has met his minimal credible basis burden by identifying evidence supporting questions concerning the use of IndusHealth metrics stemming from the discrepancies between the IndusHealth Term Sheet and WCH's subsequent conduct; questions arising from the November 2024 and April 2025 financing rounds; and WCH's sole-director structure, disclosed on December 1, 2025, which, although insufficient by itself to establish wrongdoing, supports a targeted inspection into the Company's governance, among others. Taken together, these facts satisfy Plaintiff's minimal burden to establish a credible basis from which the Court may infer possible corporate mismanagement or disclosure issues.

That conclusion does not, however, transform every subject identified in the November Demand and subsequent Complaint into an independent proper purpose for inspection. As previously noted, although the November Demand sought records concerning IndusHealth and the Term Sheet, it did not separately identify evaluation of WCH's potential exposure arising from those matters as a purpose for inspection. The Complaint later characterized Plaintiff's purposes even more broadly to include evaluating the Company's exposure to potential claims arising from discrepancies between the IndusHealth Term Sheet and representations made to investors.[81] To the extent Plaintiff now advances that theory as an additional proper purpose, it must

---

[81] D.I. 1 at 3.

independently satisfy Section 220's requirement that the purpose be reasonably related to Plaintiff's interest as a WCH stockholder.

As such, Plaintiff does not satisfy his burden regarding his additional asserted purpose of evaluating the Company's exposure to potential claims arising from the discrepancies between the IndusHealth Term Sheet and investor presentations, because that purpose arises out of Plaintiff's role in the transaction rather than his role as a stockholder of WCH. Section 220 protects interests held in a stockholder capacity, not personal contractual or transactional disputes.[82] Therefore, Plaintiff's first and second asserted purposes constitute proper purposes under Section 220.

### G.    Plaintiff is Limited to Documents that are Necessary and Essential

Having concluded that Plaintiff established proper purposes for inspection, the Court must determine the scope of the inspection to which Plaintiff is entitled. Under the amended Section 220, inspection is limited to books and records that are necessary and essential to accomplish the stockholder's proper purposes.[83]

WCH argues that the enumerated categories set forth in Section 220(a)(1) ordinarily satisfy that standard and that inspection beyond those categories requires Plaintiff to establish, by clear and convincing evidence, a compelling need for

---

[82]   8 Del. C. § 220 builds the stockholder-capacity limitation directly into its text, tying every element of the inspection right to the stockholder's articulated purpose.

[83]   *Moran v. Unation, Inc.*, 2025 WL 3706330, at *5 (Del. Ch. Dec. 22, 2025).

additional materials.[84]   I agree.   The Court, therefore, evaluates each category of Plaintiff's amended requests separately.

### 1.   IndusHealth Definitive Agreements and Approvals

To the extent formal board-level records exist concerning the proposed transaction, including board minutes, written consents, or board materials presented to the sole director, those records fall within Sections 220(a)(1)(e)–(f) and shall be produced.  The record, however, does not establish that the proposed transaction was ever formally approved by WCH's board or sole director.  Accordingly, if no such formal records exist, WCH shall certify that no such records exist.  Plaintiff has not established, by clear and convincing evidence, a compelling need for third-party operational files, transaction files, or other materials outside the categories enumerated in Section 220(a)(1).  Those requests are therefore denied.

### 2.   Board-Level Materials Concerning the November 2024 and April 2025 Financing Rounds

Plaintiff seeks records relating to WCH's November 2024 and April 2025 financing rounds.  Those records are necessary and essential to Plaintiff's established purpose of investigating the Company's use of IndusHealth information and disclosures made in connection with those financings.  Accordingly, to the extent they exist, WCH shall produce board minutes, written consents, and board materials

---

[84]  D.I. 36 at 35.

described in Sections 220(a)(1)(e)–(f) approving or relating to the November 2024 and April 2025 financing rounds, limited to materials from May 2024 forward that are sufficient to reflect the basis for the board's consideration of those transactions and the materials presented in connection with them. Investor-facing pitch decks, offering materials, or similar materials that were presented to or considered by the board or sole director fall within Section 220(a)(1)(f) and shall be produced. Plaintiff has not established, by clear and convincing evidence, a compelling need for broader investor communications that were not presented to the board or sole director. Those requests are therefore denied.

### 3. Valuation of Shares

Plaintiff seeks books and records necessary to value his ownership interest in WCH. Because the Court has concluded that valuation constitutes a proper purpose under Section 220, Plaintiff is entitled to those records necessary and essential to accomplish that purpose. Accordingly, WCH shall produce the Company's annual financial statements for the three years preceding Plaintiff's November 26, 2025 demand under Section 220(a)(1)(g), together with the current stock ledger and capitalization table sufficient to permit Plaintiff to value his holdings. Plaintiff's request for informal communications relating to valuation is denied because Plaintiff has not established, by clear and convincing evidence, a compelling need for materials beyond those enumerated in Section 220(a)(1).

### 4. Information Regarding Plaintiff's Termination and Accelerated Vesting

Plaintiff seeks records concerning his November 10, 2025, termination and any resulting effect on his equity interest. Plaintiff relies on the Goal Sheet's provision providing for accelerated vesting if terminated without Cause and seeks records concerning the approval of his termination and any determination regarding Cause to resolve his share count and value his holdings. The termination records that relate to his share count and equity interest are necessary and essential to Plaintiff's established purpose of valuing his ownership interest.

Accordingly, WCH shall produce board minutes, written consents, and board materials within the categories identified in Section 220(a)(1)(e)–(f) concerning the approval of Plaintiff's November 10, 2025, termination and any determination regarding Cause, limited to records reflecting the board's action and the materials presented in connection with that action. Plaintiff's request for broader human resources files and internal communications concerning his termination is denied because those materials are not necessary and essential to accomplish Plaintiff's proper purposes.

### 5. Waiver-Related Materials

Plaintiff seeks documents presented to or created by directors or officers concerning the inclusion or implementation of Section 15 of the Option Agreement. This goes to his purpose of investigating potential mismanagement, wrongdoing,

and breaches of fiduciary duty. WCH represents that no such board-level materials exist beyond the executed Option Agreement itself. To the extent no board minutes, written consents, or other board materials within the categories identified in Section 220(a)(1)(e)–(f) exist concerning Section 15, WCH shall certify that no such records exist. Requests for communications with outside counsel concerning the drafting or implementation of Section 15 are denied as protected by the attorney-client privilege.

### 6. Remaining Requests for Communications and Other Broad Categories of Documents

Plaintiff seeks communications concerning his equity interest, his termination, the CEO's alleged request to purchase Plaintiff's shares, and various requests seeking "any records" relating to those subjects. Those requests are denied. They are overbroad, not confined to the categories of books and records identified in Section 220(a)(1), or they concern matters personal to Plaintiff rather than interests held in his capacity as a WCH stockholder.

Accordingly, Plaintiff has not established that those materials are necessary and essential to accomplish his proper purposes, nor has he demonstrated a compelling need for materials outside the categories enumerated in Section 220(a)(1). Plaintiff's inspection is limited to the formal board-level materials and financial records ordered above.

## H.    Attorneys' Fees, Costs, and Confidentiality

Plaintiff seeks fees and costs under Section 220(c) and the American Rule, arguing that WCH unjustifiably refused his demand and employed overly aggressive tactics.[85]  WCH  argues it acted in good faith in relying on Section 15 of the Option Agreement, the amended statute, and that Plaintiff's earlier demands were procedurally defective.[86]

As noted in *FON Holdings,* "Delaware courts follow the American Rule that 'each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation.'  An exception exists in equity, however, when a party litigates in bad faith.  This Court has recognized that in 'extraordinary circumstances,' 'overly aggressive litigation strategies' employed to improperly resist a books and records demand may warrant fee-shifting.  A party seeking to shift fees must satisfy 'the stringent evidentiary burden of producing 'clear evidence' of bad faith ....'  To warrant fees, a litigant's conduct must be 'glaring[ly] egregious.'"[87]

As only Plaintiff's November 26, 2025, demand satisfied Section 220's procedural requirements, and WCH advanced colorable arguments concerning the enforceability of Section 15 and the scope of inspection under the amended statute,

---

[85]  D.I. 34 at 35–37.

[86]  *See generally* D.I. 36.

[87]  *Jones v. FON Hldngs*., *LLC*, 2024 WL 3508528, at *6 (Del. Ch. July 23, 2024) (internal citations omitted).

these circumstances do not warrant bad faith or an unjustified refusal. Under the American Rule, fees may be shifted upon clear evidence of bad faith; a standard which was not met on this record. The Court applies the American Rule and the bad faith exception as articulated in *FON Holdings* and finds no clear evidence of bad faith on this record. Plaintiff's request for fee shifting and costs is, therefore, denied.

WCH also requests that any production ordered be subject to a confidentiality order.[88] The present record does not reflect whether the parties have agreed upon an appropriate confidentiality protocol or whether such relief remains disputed. Accordingly, if the parties cannot reach an agreement, they may submit a proposed confidentiality order or otherwise seek appropriate relief from the Court.

## IV. SUMMARY OF PRODUCTION

### A. Defendant SHALL produce the following books and records:

1. Board minutes and written consents responsive to 8 Del. C. § 220(a)(1)(e), from May 1, 2024, through the present, limited to those concerning: (i) the approval of, or actions relating to, the IndusHealth transaction; (ii) the November 2024 and April 2025 financing transactions; (iii) the authorization or issuance of Plaintiff's equity interests, to the extent such matters were addressed at the board level; and (iv) Plaintiff's November 10, 2025 termination, including any determination that Plaintiff was terminated for Cause.

2. Materials provided to the board (or sole director) in connection with the foregoing actions, responsive to 8 Del. C. § 220(a)(1)(f), including any investor presentations, offering materials, or comparable board materials presented to or considered by the board in connection with its approval of the November 2024 and April 2025 financings.

---

[88] D.I. 36 at 47–48.

3. Annual financial statements for the three fiscal years preceding November 26, 2025, responsive to 8 Del. C. § 220(a)(1)(g), together with the current stock ledger and capitalization table sufficient to permit Plaintiff to value his ownership interest.

**B.**    **The Court DENIES Plaintiff's requests for:**

1. Informal communications, including emails and text messages, that do not fall within the categories of books and records identified in 8 Del. C. § 220(a)(1)(e) or (f);

2. Generalized requests for "any records" or similarly open-ended categories of documents; and

3. Individualized personnel, human resources, or contract files that were neither presented to nor considered by the board.

**C.**    **Conditions of Inspection**

1. Barring the filing of exceptions, the parties shall submit a stipulated confidentiality order within fourteen (14) days of the issuance of this Final Report. If the parties cannot reach an agreement, the parties may submit a proposed confidentiality order or otherwise seek appropriate relief from the Court.

2. Plaintiff's request for an award of costs and expenses under 8 Del. C. § 220(c) is **DENIED**.

3. Plaintiff's request for fee shifting under the bad-faith exception to the American Rule is also **DENIED**.

**V.**    **CONCLUSION**

For the reasons above, Plaintiff's request to inspect WCH's books and records is **GRANTED** in part and **DENIED** in part. Plaintiff's November 26, 2025, verified demand is the only demand that satisfied Section 220's procedural requirements and

is the only demand properly before the Court. Plaintiff's March 21, 2025, April 4, 2025, and October 20, 2025, demands are denied for failure to satisfy Section 220's stockholder-status and form-and-manner requirements.

The Court further concludes that Section 15 of the Option Agreement does not bar Plaintiff's November 26, 2025, verified demand. Plaintiff established proper purposes to inspect books and records relating to the valuation of his ownership interest and the investigation of potential corporate mismanagement. Plaintiff's inspection, however, is limited to those books and records that are necessary and essential to accomplish those purposes and otherwise satisfy the limitations imposed by the amended Section 220. All remaining requests are denied.

This is the Court's Final Report and expedited exceptions may be filed within three days under Court of Chancery Rule 144.